GRAND ROYAL CIRCLE OF FRIENDS OF TENNESSEE v.
SUPREME ROYAL CIRCLE OF FRIENDS OF THE WORLD,
et al.

Western Section. July 30, 1929.

Petition for Certiorari denied by Supreme Court, March 1, 1930.

W. H. Bentley, of Memphis, for appellee.
W. H. Foote and E. B. Williams, of Memphis, for appellants.

OWEN, J. The defendant, Supreme Royal Circle of Friends of
the World, a fraternal benefit society duly licensed to do a fraternal
insurance business in Tennessee, has appealed from a decree ren-
dered against it in favor of the complainant for twelve hundred
($1200) dollars. It appears that the defendant was chartered under
the laws of the State of Arkansas and operated in a number of
States of the Union. It began its operations in Tennessee prior to
1913. In 1913 the complainant obtained a charter to do business in
Tennessee. Evidently there was a good deal of rivalry between these
two societies and in January, 1922, the complainant filed a bill against
the defendant and this litigation ended by complainant's bill being
dismissed without prejudice after pending in the chancery court of
Shelby county for some years.

On April 7, 1924, the complainant and D. J. Thomas, J. T. Wyatt,
S. R. Thomas and C. D. Coleman, members of the complainant body,
on behalf of themselves and all other members of said complainant
organization, filed the bill in the instant case in the Chancery Court
of Shelby county against the defendant and Dr. R. A. Williams, Dr.
E. M. Wilkins and several other defendants. The bill sought, (1)
To enjoin the defendants from operating the organization, known as

the Supreme Royal Circle of Friends of the World, in Tennessee. (2) The complainants sought a judgment against the defendants for moneys wrongfully expended by the defendant outside of the jurisdiction of Tennessee during the time complainants were affiliated with the defendants. (3) The complainants sought to recover all the moneys contributed by the members of the complainant circle towards the purchase of Liberty Bonds and which funds or Liberty Bonds were used by the defendant in establishing hospitals in Tennessee at Memphis and in Arkansas at Hot Springs, and Little Rock. (4) The bill prayed for general relief.

A joint answer was filed by all of the defendants denying all the material allegations of the bill and they prayed for a dissolution of the injunction. An injunction had been issued shortly after the filing of the bill, that, however, was modified in a very short time after its issuance. Numerous depositions were taken and upon hearing the Chancellor denied the complainant the right of any injunctive relief and denied any relief against all of the defendants except the Supreme Royal Circle and as to it the Chancellor ordered a reference to the Clerk and Master to take proof in addition to the proof already filed and report on the following items:

"I.

"What moneys, if any, have been wrongfully expended by the defendant, Supreme Royal Circle of Friends of the World outside the jurisdiction of Tennessee during the period of affiliation.

"II.

"What moneys, if any, were contributed by the members of the Grand Royal Circle of Friends of Tennessee to the purchase of Liberty Bonds and were used in the purchase of the hospital in Memphis and what is the affiliation, if any, of these members now."

Proof was taken before the Master upon the reference and the Master reported and found as follows:

"I.

"The Master reports that the proof shows no money wrongfully expended by the Supreme Royal Circle of Friends of the World outside the jurisdiction of Tennessee during the period of affiliation.

"II.

"The proof shows and the Master so reports that $1200 was contributed by the members of the Grand Royal Circle of Friends of Tennessee to the purchase of Liberty Bonds and which was used in the purchase of the Royal Circle Hospital in Memphis, and that the Supreme Royal Circle of Friends of the World and

the Grand Royal Circle of Friends of Tennessee, make use of said hospital.''

Exceptions were filed to the Master's report, the Chancellor overruling complainant's exception as to the first item and as to the second item there was no exception as to the amount of $1200 having been contributed by the members of Tennessee but complainant's exception made as to the use of said hospital was sustained. The Chancellor held that the complainants had made use of said hospital for about six months prior to the filing of the bill in the instant case and had not made use of the hospital in Memphis, Tennessee, since the filing of said bill. Whereupon the Chancellor rendered a judgment in favor of the complainant, Grank Royal Circle of Friends of Tennessee and against the Supreme Royal Circle of Friends of the World for $1200 and one-half of the costs.

Defendant excepted, prayed and perfected an appeal to this court and has assigned two errors. By the first error it is insisted that the Chancellor erred in sustaining the exception to that part of the Clerk and Master's report wherein the Master found that both the complainant, Grand Royal Circle of Friends of Tennessee, and defendant, Supreme Royal Circle of Friends of the World, make use of the Royal Circle Hospital at Memphis and in holding that they did have and make use of the Royal Circle Hospital for a period of about six months prior to the institution of this suit but complainant had not had the use of the hospital since the institution of this litigation.

(2) It was error for the Chancellor to render a judgment for $1200 and one-half of the costs against the defendant.

The record in the instant case shows the following history of these two litigants as found by the Chancellor in his finding of facts:

"The complainant, Royal Circle, both before and after its incorporation in 1913, affiliated with the Supreme Circle. This continued down to the time of the breach of friendly relation in the year 1921. The business of the society in Tennessee was handled by and through the Royal Circle from 1916 down to said breach. Said Royal Circle was acting under a charter granted it by said Supreme Circle from the beginning. The officers and members of said Grand Circle acknowledged fealty and paid tribute to the Supreme Circle. Two years before the incorporation of the Royal Circle, the Supreme Circle, through its president, R. A. Williams, organized subordinate lodges in Memphis and vicinity. Thereafter it was considered proper to incorporate the society in Tennessee. This was done, and the corporation named the Royal Circle of Friends of Tennessee. A benefit certificate was issued to each member of the subordinate circle in Tennessee and these certificates recited on their face that they were issued

by the Grand Royal Circle of Friends of the World, chartered and incorporated under the laws of the State of Tennessee.

No accounting has been had between the complainant Royal Circle and the defendant, the Supreme Circle, as to business transacted prior to the institution of the former suit. A. F. Ward was appointed receiver in the former suit; Mrs. Estelle Wilson, one of the defendants here, was then Treasurer of the Grand Circle, and on demand of the receiver she turned over to him the funds of the organization to the amount of $6880.53 and all the books and other records of the society. At that time there was but one organization operating in Tennessee, and known as the Royal Circle of Friends of Tennessee.

Ward testifies in this case that he took into his possession as receiver, all of the funds of the Royal Circle, as far as he was informed. The receiver collected considerable moneys during the period of former litigation; he made his financial report to the court and had a net balance left in his hands, after being allowed his disbursements, of $1426, which he turned over to one Roddy, Treasurer of the Royal Circle.

In 1920 the president of the Supreme Circle, the defendant organization, decreed a $2 per capita tax upon all members of the order for the purpose of maintaining a hospital. This was a compulsory tax, and all members were required to pay same or stand "unfinancial." In 1921, the Supreme Circle purchased the property at 925 So. Fifth street, Memphis, Tennessee, and took title in the name of Supreme Circle of Friends of the World. Said hospital is known as the Royal Circle Hospital, and the cost price of the property was $9000. This money was raised by assessing each member of the order the sum of $1 during the year 1918, for the purpose of buying Liberty Bonds. Peace was declared before the bonds were purchased. That is, peace was declared between the warring nations of the World, but not peace between these two colored societies, and the money so raised for the purchase of the Liberty Bonds was used in buying the hospital. Whether the whole purchase price was paid by members in Tennessee, I cannot say from this record, and the reference to the Master will include the question of what moneys, if any, were contributed by members of the Royal Circle of Tennessee to the purchaser of Liberty Bonds, and used in the payment of the purchase price of the hospital. The $2 per capita for the maintenance of the hospital will not be included in the reference. The hospital was in operation before the falling out between the parties, in the fall of 1921, and there could be no way of ascertaining what benefits were derived from the hospital by members of the Royal Circle. The use of the hospital was open to them for a period of something over six months before the row took place. Furthermore, a large number of

the organization followed the Supreme Circle after the separation and ceased to be members of the Royal Circle, and thus continued to be entitled to hospital benefits.''

Dr. E. M. Wilkins testified that he was the Superintendent of the Royal Circle Hospital in Memphis, Tennessee, and had been superintendent since its organization in April, 1921; that the primary purpose of this hospital was to treat members of the organization free of charge but the hospital did not turn away any colored person and treated all worthy charity applicants; that no worthy person had ever been turned away regardless of his or her application. That the hospital had six physicians on its staff and six nurses, five of the nurses being graduate nurses and five nurses in training. This witness testified that during the year of 1921, the hospital treated something more than five hundred people, all of these were members of the complainant circle. The witness explains that during the year 1921, that the complainant and defendant were operating as one circle in Tennessee. It appears that about the time that the defendant and the complainant split or as the complainant stated in their bill, desired to ''throw off the yoke,'' the defendant had in the various states of the Union about one hundred thousand members. In 1918 the defendant, through its officers, issued an edict whereby every member was to contribute $1 for the purpose of purchasing Liberty Loan Bonds. It appears that the members of Tennessee contributed towards this worthy and patriotic object about $1200. Later on by proper resolutions or laws enacted by the Supreme Circle the Liberty Loan Bonds were used for establishing hospitals, one being established in Memphis, Tennessee. E. B. Williams, business manager of the Royal Circle Hospital of Memphis, testified that he had charge of all the books, records and the entire management of the business side of the hospital; that he had been manager of said hospital since its institution from the time of its beginning of operations, April, 1921, to June 1, 1925. There had been treated in this hospital, 1282 patients; that 182 major operations had been performed; that between April 12, 1921 and January 1, 1922, eighty-six members of the complainant circle had been treated in this hospital and of this eighty-six there were eleven major operations. This witness further stated that no member of the complainant circle had been treated in said hospital since January 1, 1922, about the time that the first litigation between these two fraternal factions was commenced, there is no exception to the finding of the Master that the complainant circle paid $1200 for Liberty Bonds.

The witness Estelle Wilson, who is now affiliated with the defendant but was secretary of the complainant circle at the time of the

purchase of the Liberty Bonds, testified that $1200 was contributed by the complainant.

The Clerk and Master reported that the complainant and defendant, at the time of his report October 18, 1927, make use of the Royal Circle Hospital in Memphis, Tennessee.

The Chancellor found that the complainant's members were not making use of the hospital and had not made use of said hospital since January 1, 1922.

The record supports the Chancellor's finding as to the use of the hospital, however, we do not think that the defendant should be charged with the entire $1200. The complainant had the right and did make use of the hospital for more than eight and one-half months, from April 12, 1921 to January 1, 1922. Eighty-six of complainant's members were treated free of charge in said hospital during this period. Many of the members of the complainant, since the split, have become affiliated with the defendant, such members are not seeking to have their $1 returned, in fact, it is to their interest to let the $1 contributed by such members remain with the defendant.

We are of the opinion that the Chancellor erred in rendering a decree against the defendant for any amount; for the reason that when the complainant and its members contributed the $1200 towards the purchase of Liberty Bonds, that this amount was voluntary and the complainant at that time acknowledged the right of the defendant to use the funds contributed towards the purchase, erection and maintenance of a hospital. Furthermore, the complainant withdrew from the defendant and by so doing, the complainant waived and forfeited all of its claims against the defendants for contributions, dues and assessments paid to the defendant prior to the complainant's withdrawal. Under section 3369a-85, Shannon's Code, it is provided in reference to Fraternal Benefit Societies, that:

"Any society may create, maintain, invest, disburse, and apply an emergency, surplus or other similar fund in accordance with its laws. Unless otherwise provided in the contract, such funds shall be held, be invested and disbursed for the use and benefit of the society and no member or beneficiary shall have or acquire individual rights therein or become entitled to any apportionment, or surrender of any part thereof, . . . ."

It results that the assignments are sustained, the judgment of the lower court is reversed and complainant's bill dismissed. Complainant and his sureties on the prosecution bond will pay the cost of the cause, including the cost of the appeal, for which let execution issue.

Heiskell and Senter, JJ., concur.